1  Erin Rose Ronstadt, SBN 028362
   Kevin Koelbel, SBN 016599
2  OBER & PEKAS, PLLC
   3030 North 3rd Street, Suite 1230
3  Phoenix, AZ 85012
   (602) 277-1745
4  (602) 761-4443 Fax
   erin@oberpekas.com
5  kevin@oberpekas.com

6  Attorneys for Plaintiff

7              IN THE UNITED STATES DISTRICT COURT

8              FOR THE DISTRICT OF ARIZONA

9  Ismelda Garza f/k/a Ismelda Sapien, a          No.
   single woman,
10
                              Plaintiff,
11
   v.                                             COMPLAINT
12 Metropolitan Life Insurance Company, a
   plan fiduciary; Verizon Wireless Managed
13 Disability Benefits, an ERISA benefit plan;
   Cellco Partnership d/b/a Verizon Wireless
14 and Affiliates, a plan sponsor and/or plan
   administrator; and Verizon Wireless
15 Employee Benefits Committee, a plan
   administrator,
16                            Defendants.

17       For her claims against Defendants Metropolitan Life Insurance Company ("MetLife")

18 Verizon Wireless Managed Disability Benefits (the "Plan"), Cellco Partnership d/b/a Verizon

19 Wireless and Affiliates ("Verizon") and Verizon Wireless Employee Benefits Committee (the

20 "Committee") (collectively "Defendants"), Plaintiff Ismelda Garza ("Ms. Garza" or

21 "Plaintiff") alleges as follows:

22            JURISDICTION, VENUE AND PARTIES

23       1.      This action arises under the Employee Retirement Income Security Act of

24 1974, 29 U.S.C. §§ 1001 et seq. ("ERISA").

25       2.      The Plan is a purported ERISA benefit plan established and maintained by

26 Verizon for the benefit of its employees. The Plan is a welfare benefit plan that offers group

27 short-term disability ("STD") and long-term disability ("LTD") benefits.

28

3. Verizon is the Plan Sponsor and Employer.

4. Verizon is identified as the Plan Administrator in the Managed Disability Summary Plan Description.

5. The Committee is identified as the Plan Administrator in the Verizon Wireless Health and Welfare Benefits Plan, which includes the Plan.

6. At all relevant times, MetLife administered claims for Verizon under the Plan, acted on behalf of the Plan, and acted as an agent for Verizon.

7. MetLife fully insures LTD benefits under the Plan with a Policy, Group Policy Number 96398-G.

8. At all relevant times, Ms. Garza was a participant and beneficiary of the Plan as an employee of Verizon.

9. Ms. Garza was married at the time of her employment, but is unmarried now.

10. At all relevant times Ms. Garza was a resident of Maricopa County.

11. The Plan and Verizon have their principal place of business in the state of New Jersey.

12. MetLife has its principal place of business in the state of Kentucky.

13. MetLife and Verizon are licensed and authorized to do business in Maricopa County, Arizona, and reside and are found within Maricopa County within the meaning of the jurisdiction and venue provisions of ERISA, 29 U.S.C. § 1132 and 28 U.S.C. § 1391.

14. This Court has jurisdiction over the subject matter of this action under ERISA, 29 U.S.C. §§ 1132(a), 1132(e)(1), and 28 U.S.C. §§ 2201-02 (declaratory judgments).

15. Venue is proper in this Court under ERISA, 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1391(b).

16. Verizon has a duty to administer the plan prudently and in the best interests of all Plan members and beneficiaries.

17. MetLife acted as Verizon's agent to make final decisions regarding the payment of disability benefits for the Plan and to administer the Plan.

18. Ms. Garza is informed and believes that Verizon and MetLife are each either

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

a "named fiduciary" of the Plan, pursuant to 29 U.S.C. § 1133(2); a "deemed fiduciary" pursuant to 29 U.S.C. § 1002 (21)(A); or a "designated fiduciary" pursuant to 29 U.S.C. § 1105(c)(1)(B).

19.    MetLife had actual or apparent authority to act as a fiduciary on behalf of the Plan.

20.    MetLife's third-party vendors had actual or apparent authority to act as fiduciaries on behalf of the Plan and administered the Plan by providing services to Defendants.

21.    On information and belief, MetLife acted under a structural conflict of interest in both administering and paying out on claims under the Plan.

22.    Ms. Garza is entitled to de novo review of her claims, because of MetLife's structural conflict of interest and its "wholesale and flagrant violations of the procedural requirements of ERISA."

23.    MetLife should not be entitled to any deference in its decision-making in light of the facts and circumstances of this claim.

### GENERAL ALLEGATIONS

24.    All previous and subsequent paragraphs are incorporated by reference.

*Ms. Garza's Employment*

25.    Ms. Garza began working for Verizon on September 8, 2003 and worked in the call center as a Customer Service Representative.

26.    Ms. Garza's job consisted of answering inbound calls from customers to assist with billing questions, technical support, or questions regarding products and services.

27.    Ms. Garza worked forty hours per week and occasionally worked weekends and overtime if offered.

28.    The majority of Ms. Garza's job required excellent verbal communication skills with customers, as well as frequent sitting and typing, and the ability to multi-task.

29.    Ms. Garza has had longstanding vocal disturbances as far back as 2003.

30.    Ms. Garza began experiencing increased vocal disturbance and difficulty

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

swallowing, which affected her ability to effectively communicate with customers.

31.     Because the majority of Ms. Garza's job was to verbally communicate with customers, she was forced to miss work many times under her doctors' advisement.

32.     In 2012, the severity of Ms. Garza's symptoms increased to the point where she could no longer work.

33.     Ms. Garza's last day of work was on November 9, 2012.

*Ms. Garza's Disability Benefits Under the Plan*

34.     To be eligible for LTD benefits, Ms. Garza must be "Disabled . . . due to Sickness or as a direct result of accidental injury" and, as a result, be "receiving Appropriate Care and Treatment and complying with the requirements of such treatment, and be "unable to earn: during the Elimination Period and the next 24 months of Sickness or as a direct result of accidental injury, more than 80% of [her] Predisability Earnings at [her] Own Occupation from any employer in [her] Local Economy."

35.     A "Customer Service Representative" is considered to be her Own Occupation under the Plan.

36.     Appropriate Care and Treatment is defined as medical care and treatment that is: "given by a Physician whose medical training and clinical specialty are appropriate for treating [the] Disability; consistent in type, frequency and duration of treatment with relevant guidelines of national medical research, health care coverage organizations and governmental agencies; consistent with Physician's diagnosis of [the] Disability; and intended to maximize [sic] medical and functional improvement."

37.     Local Economy is defined as "the geographic area within which [Ms. Garza] reside[s]; and which offers suitable employment opportunities within a reasonable travel distance." If the claimant moves on or after the date of Disability, MetLife may consider both the former and current residence as the Local Economy.

38.     To be eligible for LTD benefits after 24 months, as a result of her Disability, Ms. Garza must be unable to earn "more than 60% of [her] Predisability Earnings from any employer in [her] Local Economy at any gainful occupation for which [she is] reasonably

1    qualified taking into account [her] training, education and experience."

2        39.    Under the Plan, Ms. Garza could be entitled to LTD benefits until her Social

3    Security Normal Retirement Age ("SSNRA"), which is age 67.

4        40.    Ms. Garza is entitled to receive 60% of her Predisability Earnings, before any

5    applicable offsets.

6                        *Ms. Garza's Receipt of STD and LTD Benefits*

7        41.    Ms. Garza began experiencing severe vocal disturbance and difficulty

8    swallowing in 2012.

9        42.    As a result, Ms. Garza applied for and MetLife approved STD benefits from

10   November 10, 2012 to the maximum benefit period of June 20, 2013.

11       43.    On June 13, 2013, Ms. Garza was diagnosed with papillary thyroid carcinoma

12   ("thyroid cancer").

13       44.    Over the next several months, Ms. Garza underwent aggressive treatment for

14   her thyroid cancer, causing permanent damage to her vocal chords, which triggered other

15   medical problems in addition to her inability to speak.

16       45.    MetLife initiated Ms. Garza's LTD benefits claim on or around October 3,

17   2013.

18       46.    On October 16, 2013, MetLife performed a benefits offset review.

19       47.    Every question in the benefits and offset review was directed towards

20   reducing MetLife's liability rather than confirming Ms. Garza's right to benefits, which

21   evidences MetLife's conflict of interest.

22       48.    On October 18, 2013, MetLife's Senior Claims Specialist, Irene Jensen,

23   conducted a telephonic interview with Ms. Garza, during which Ms. Jensen noted that it

24   was "nearly impossible to understand anything [she] was saying."

25       49.    Ms. Garza's speech was so difficult to understand that her husband had to

26   finish the interview for her.

27       50.    Ms. Jensen later determined that "sudden recovery [was] not expected," and

28   on October 24, 2013, she approved Ms. Garza's LTD claim beginning on June 21, 2013.

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

51.     That same day, Ms. Jensen called Ms. Garza to inform her of the LTD approval and, again, "couldnot [sic] understand anything, truly anything, [Ms. Garza] said."

52.     Since the beginning of Ms. Garza's LTD claim, MetLife had intentions of not paying Ms. Garza past the Any Occupation period; on October 22, 2013, Ms. Jensen noted, "expect imprvmntfor [sic] own [occ] prior to Any Occ date."

53.     On or around October 28, 2013, MetLife reassigned Ms. Garza's claim to LTD Claims Specialist, Krista Page.

54.     After reviewing the file, Ms. Page concluded that the medical information "cont[inued] to sup[port] ong[oing] inability to RTW in [Ms. Garza's Own Occupation]."

55.     On January 29, 2014, Ms. Page telephoned Ms. Garza for an update on her medical conditions and noted that Ms. Garza was "barely able to speak."

56.     Given that it was impossible to telephonically communicate with Ms. Garza, Ms. Page decided to obtain the information through an Activities of Daily Living form.

57.     Over the next several months, Ms. Page monitored Ms. Garza's claim and, based exclusively on Ms. Garza's vocal disability and the supporting medical evidence, Ms. Page continued to find Ms. Garza Disabled from her Own Occupation.

58.     On October 20, 2014, MetLife initiated its review of Ms. Garza's LTD claim under the Any Occupation definition of period.

59.     Ms. Page noted a "poss[ible] early [Any Occupation] approval" due to Ms. Garza's severe vocal dysfunction.

60.     Shortly thereafter, MetLife transferred Ms. Garza's claim to LTD Claims Specialist, Luann Viviani, who then referred the file to MetLife's Nurse Consultant, Elena Wells.

61.     Ms. Wells noted that the "medical information reviewed is not clear whether [Restrictions and Limitations] from voice use continue to be supported," and acknowledged that Ms. Garza was "under observation" for two small nodules found in her thyroid.

62.     Ms. Wells further noted, "in documentation by [claims specialists] and at several [office visit notes] by [healthcare providers] that [Ms. Garza] was difficult to

6

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

1   understand and she was typing her answers or questions on her phone."

2   63.   Ms. Wells recommended obtaining updated medical records from only a

3   select few of Ms. Garza's physicians, as well as an "Attending Physician Statement" from

4   only one physician – Ms. Garza's primary care physician, Dr. Briones.

5   64.   Ms. Wells did not request clarification or restrictions from Ms. Garza's ear

6   nose and throat ("ENT") doctors or endocrinologist, Dr. Sreedevi Reddy.

7   65.   Ms. Wells instead misconstrued one ambiguous statement made by ENT Dr.

8   Reidy, and made accusations that Ms. Garza's voice disturbance was "psychogenic" in

9   nature.

10   66.   Ms. Wells spoke with ENT Dr. Jensen on March 16, 2015 to follow-up on

11   MetLife's medical records request and made no attempt to obtain any information from Dr.

12   Jensen with respect to Ms. Garza's voice restrictions and limitations.

13   67.   On March 10, 2015, Dr. Briones' Physician's Assistant, Heather Leazer,

14   completed a physician form regarding Ms. Garza's restrictions and limitations.

15   68.   Ms. Leazer stated on the form, "unable to communicate clearly w/

16   customers" under restrictions to work activity.

17   69.   Ms. Leazer included reduced restrictions with respect to sitting, standing, and

18   walking that were contraindicated by the medical evidence on file and misrepresented Ms.

19   Garza's true limitations.

20   70.   Ms. Wells made no attempts to contact Ms. Garza, despite evidence from

21   MetLife's own employees of the extreme difficulty in communicating with Ms. Garza.

22   71.   MetLife transferred Ms. Garza's file to another Nurse Consultant named

23   Sarah Waterman.

24   72.   On April 10, 2015, Ms. Waterman received an incoming call from Ms. Garza

25   and her husband and stated as follows:

26   **NC did not realize the severity of ee vocal dysfunction until after phone
27   [sic] incoming phone callfromEe [sic] . . . NC realized [Ms. Garza's]
     vocal dysfunction was severe as Nc had great difficulty understanding
28   [Ms. Garza].**

7

1   (emphasis added)

2       73.     During the call, Ms. Waterman asked about upcoming testing for her neck

3   issues. With the help of her husband, Ms. Garza explained to Ms. Waterman that she had

4   limited income and could not afford necessary tests and treatment at the time.

5       74.     Ms. Wells contacted Ms. Garza on April 21, 2015 to follow-up on treatment

6   that was still pending and, again, "could not understand" Ms. Garza.

7       75.     Ms. Garza was still unable to afford the treatment needed at the time.

8       76.     On May 5, 2015, after several follow-ups with Dr. Briones' office, MetLife's

9   Nurse Consultant, Susan Michaud, learned that certain tests had not yet been ordered, and

10  that Ms. Garza was referred to a spine specialist.

11                  *Physician Review and Employability Analysis Report*

12      77.     While upcoming treatment was pending, Ms. Michaud referred Ms. Garza's

13  file to medical director, Dr. Katrina Turner, for review to find out: 1) whether an ENT

14  independent medical evaluation ("IME") or other testing was necessary, and 2) whether the

15  medical evidence supported any restrictions and limitations due to Ms. Garza's persistent

16  neck and arm pain.

17      78.     Dr. Turner relied on medical records and documentation from: Drs. Jensen,

18  Briones, Reddy, Reidy, Mendelson, and Blankinship Physical Therapy.

19      79.     On May 6, 2015, Dr. Turner contacted Dr. Briones' office and spoke with the

20  office manager, Terry.

21      80.     Dr. Turner discussed Ms. Leazer's March 10, 2015 physician form, and her

22  concerns with the inconsistent restrictions and limitations placed on Ms. Garza, specifically

23  the indication that she could perform fine finger movements and eye/hand movements for

24  only one hour a day, but could supposedly lift up to 50 pounds.

25      81.     Terry, the office manager, suggested that the restrictions and limitations were

26  assessed based on Ms. Garza's self-reported symptoms.

27      82.     The Plan requires MetLife to consider Ms. Garza's subjective complaints and

28  self-reported symptoms.

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

83.    Terry further stated she would inform Dr. Briones of Dr. Turner's concerns and provide an update. Terry also noted that Ms. Garza "was very difficult to understand on the phone."

84.    Dr. Briones never provided clarification, and MetLife made no follow-up attempts.

85.    On May 6, 2015, Dr. Turner spoke with Dr. Jensen, who confirmed office visits with Ms. Garza and that previous tests had proved there was continuing voice dysfunction post-treatment, including "hypertension in the tissues around the vocal cord."

86.    Dr. Turner never contacted Ms. Garza's other treating providers, specifically Dr. Reddy, who continued to monitor Ms. Garza after the thyroidectomy.

87.    In fact, Dr. Reddy's most recent office visit note on file at that time was one dated February 17, 2015, which indicated that Dr. Reddy was monitoring two potentially cancerous nodules that appeared on a December 2014 ultrasound, and she recommended testing in six months.

88.    On May 6, 2015 (the very same day she spoke with Dr. Briones' office and Dr. Jensen) Dr. Turner submitted her report, concluding that "a third ENT evaluation [was] not likely to reveal new findings given her chronic symptoms."

89.    An ENT IME was necessary, as Ms. Garza's dysphonia was very apparent.

90.    Despite needing clarification from Dr. Briones, Dr. Turner also concluded that "the medical information support[ed] R/Ls due to neck and bilateral arm pain: reach above shoulder level occasionally and lift/push/pull up to 50 lbs. occasionally."

91.    Dr. Turner further concluded there were not enough "clinical findings" to support restrictions and limitations regarding "repetitive fine finger and eye/hand movements and working at desk level," despite requesting clarification on this very issue.

92.    On May 8, 2015, LTD Claims Specialist Melanie Adgers contacted Ms. Garza and stated she "could not understand what [Ms. Garza] was saying."

93.    Unable to speak with Ms. Garza, Ms. Adgers continued the call with Ms. Garza's husband, who reported that she was recently referred to pain management for her

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

neck and arm pain, and they were waiting on a call from the spine specialist to schedule another appointment. He also informed Ms. Adgers of upcoming appointments with Drs. Briones and Reddy for more testing.

94.   On May 11, 2015, Ms. Michaud faxed Dr. Turner's report to Drs. Reidy and Briones for their review only; the report was never sent to Dr. Jensen for review, nor any of Ms. Garza's other physicians.

95.   No follow-up attempts were made to Ms. Garza's treating providers with respect to Dr. Turner's report.

96.   On May 18, 2015, Ms. Garza's husband called inquiring about multiple disability forms that MetLife mailed on May 12, 2015, which included a Physician, Medication and Insurance Information form; an Activities and Financial Inquiry form; and a form for each of her physicians to complete.

97.   Unable to talk at the moment, Ms. Garza's husband directed Ms. Adgers to call Ms. Garza directly. Though Ms. Adgers, again, "was not able to understand [Ms. Garza]," she explained the forms to Ms. Garza and requested the physician form be completed at her upcoming appointment on June 1, 2015.

98.   Moments later, Ms. Garza returned all forms except the physician form, which she planned to take to her appointment with Dr. Reddy on June 1, 2016 as instructed.

99.   On May 21, 2015, with no follow-ups or responses from Ms. Garza's treating providers regarding Dr. Turner's report, Ms. Michaud proceeded with her clinical assessment based on the biased report.

100.   Ms. Michaud stated, "there are no r/l for voice use," which completely disregards and intentionally ignores Ms. Garza's restrictions pertaining to her inability to communicate with customers, as well as the countless calls that took place between numerous MetLife employees and Ms. Garza in which they could not understand her at all.

101.   Instead, Ms. Michaud relied solely on restrictions that MetLife's own medical director initially had concerns about, but gave no explanation as to how those restrictions

1  were confirmed without clarification from Dr. Briones.

2      102.   Based on flawed and inconsistent restrictions, Ms. Michaud found Ms. Garza

3  capable of work and referred her claim to a Vocational Rehabilitation Consultant –

4  Elizabeth Mills.

5      103.   The next day, Ms. Adgers reviewed Ms. Michaud's assessment and agreed

6  with the direction to terminate LTD benefits, knowing that Ms. Garza was in the process of

7  providing additional medical evidence from Dr. Reddy.

8      104.   Ms. Mills' Employability Assessment ("EA") Report concluded that Ms.

9  Garza was capable of performing her Own Occupation (despite the fact that MetLife had

10  previously determined she could not), in addition to other occupations, all of which either

11  require frequent communication with customers or skills that are not supported by Ms.

12  Garza's previous training, education and experience.

13      105.   The EA Report was based on the inconsistent and contradictory limitations

14  set forth in Dr. Turner's report and MetLife's inexcusable and seemingly intentional failure

15  to consider the overwhelming evidence of Ms. Garza's voice restrictions; to consult with all

16  of Ms. Garza's treating physicians; to only speak with Dr. Briones' *office manager* and not Dr.

17  Briones personally, or even a medical professional; to get clarification regarding Ms. Garza's

18  other restrictions; to provide the opportunity for all treating providers to respond to Dr.

19  Turner's report; and to follow-up with treating providers regarding Dr. Turner's report.

20      106.   For these reasons, the EA Report was flawed and should not have been relied

21  upon.

22  *LTD Benefits Termination and Request for Relevant Documents*

23      107.   On June 1, 2015, Ms. Garza e-mailed Ms. Adgers while she was at Dr.

24  Reddy's office to inform her that, per office policy, she would submit the physician form to

25  MetLife within two weeks.

26      108.   Unbeknownst to Ms. Garza, MetLife had already made its decision to

27  terminate benefits, depriving Ms. Garza of the opportunity to submit additional supporting

28  evidence that MetLife itself had initially requested.

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

11

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

109.    MetLife issued its first denial on June 4, 2015 (the "First Denial") and failed to identify for Ms. Garza the information she needed to submit to MetLife to perfect her claim.

110.    MetLife based the First Denial on Dr. Turner's flawed report and the EA Report that was based exclusively on Dr. Turner's false restrictions.

111.    Contrary to MetLife's assertion that Ms. Garza did not follow Appropriate Care and Treatment requirements under the Plan, she submitted ample evidence that she was continuing treatment.

112.    MetLife was well aware of Ms. Garza's upcoming appointments but terminated benefits anyway.

113.    Through the assistance of counsel, Ms. Garza sent her request for relevant documents to MetLife on July 14, 2015.

114.    On July 28, 2015, in response to Ms. Garza's request letter, MetLife ordered an "Attorney Letter Referral" to "ARMP."

115.    Upon information and belief, "Litigation Specialists" Cindy Broadwater and Matt Hallford are attorneys employed by ARMP.

116.    Ms. Broadwater referred the request letter to Mr. Hallford for his review.

117.    Mr. Hallford's "Attorney response" was then forwarded to Ms. Adgers on August 7, 2015, who took no immediate action.

118.    When MetLife failed to meet the ERISA mandated 30-day deadline to respond, Ms. Garza sent a second request on August 26, 2015.

119.    Ms. Garza received MetLife's incomplete disclosures on September 16, 2015.

120.    MetLife refused to produce recordings of telephone conversations with Ms. Garza, stating they were not "relied upon for claim administration purposes and therefore [were] not part of the administrative record."

121.    The recorded telephone conversations are "relevant documents" as defined by ERISA regulations.

122.    The recorded telephone conversations are relevant under Fed. R. Civ. P. 403

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

because they will show whether the claim file notes of those telephone conversations are accurate and because they are direct evidence of Ms. Garza's inability to speak – a symptom of her disability and obstacle to her employability.

123.    That MetLife did not consider recordings of telephone conversations with Ms. Garza is in direct violation of ERISA.

124.    MetLife also failed to produce documents showing procedural safeguards against conflict of interest, claiming they were outside Department of Labor regulations and were irrelevant to disability. MetLife further stated, "**Mr. Rice** is required to provide information demonstrating that **he** is disabled within the meaning of the Plan (emphasis added)."

125.    MetLife failed to disclose other relevant information, including but not limited to, the claims history or vendor contracts for Dr. Turner, Ms. Mills, Ms. Wells, Ms. Michaud, and Ms. Waterman, as well as documents MetLife claimed to be under attorney-client privilege.

126.    MetLife's claim of attorney-client privilege is further evidence of its conflict of interest and adversarial claims handling because in the Ninth Circuit the fiduciary exception to attorney-client privilege applies to insurers under ERISA. *See Stephan v. Unum Life. Ins. Co. of Am.,* 697 F.3d 917 (9th Cir. 2012); *see also Klein v. Northwestern Mut. Life Ins. Co.,* 86 F. Supp. 2d 1120, 1133 (S.D. Cal. 2011).

*The LTD Appeal*

127.     Ms. Garza timely appealed MetLife's decision on December 1, 2015, which included updated medical records and other information to support her continued disability (the "Appeal").

128.    As part of the Appeal, Ms. Garza included a Vocational Report from an independent vocational expert, Mark Kelman, who concluded that Ms. Garza could not perform any of the jobs identified in MetLife's EA Report given Ms. Garza's severe vocal dysfunction.

129.    Upon receiving the Appeal, MetLife ordered another Attorney Letter Referral

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

to Ms. Broadwater, who assigned the Appeal to Mr. Hallford for his review.

130.   MetLife also assigned the Appeal to its Associate Claims Specialist, Ann Marie Hess.

131.   According to Ms. Hess' December 16, 2015 summary of Ms. Garza's LTD claim, a medical director by the name of Dr. Del Valle also conducted a medical review, but MetLife never disclosed any information pertaining to Dr. Del Valle.

132.   As part of Ms. Hess' summary, she included the following plan of action: "sent for AMRP review and to [Appeals Nurse Consultant] for review of [Independent Physician Consultant] specialty(s)."

133.   On December 24, 2015, Mr. Hallford completed his review of the Appeal and referred it back to Ms. Hess, although it is unclear as to what exactly his review entailed.

*Independent Physician Consultant and Vocational Reviews*

134.   On December 31, 2015, Appeals Nurse Consultant Nancy Brasefield reviewed the file and referred it to an "independent" physician consultant ("IPC") named Dr. Richard Evans, who jointly specializes in Occupational Medicine and Internal Medicine.

135.   On information and belief, Dr. Evans has a longstanding history of providing MetLife with reports that favor and support benefit terminations.

136.   Dr. Evans' January 18, 2016 report was littered with errors and was based on out-of-date information.

137.   Dr. Evans added the following new restrictions regarding Ms. Garza's voice disturbance: "due to her voice issues she would be restricted from work in a job where shouting or voice projection (teaching, preaching) would be required or from using her voice use [sic] to 15 minutes per hour." Based on these restrictions, Dr. Evans concluded that Ms. Garza "would be unable to do her own job."

138.   Dr. Evans supported the same restrictions set forth in Dr. Turner's report, despite the fact that they were flawed and inconsistent with the medical evidence on file.

139.   As part of his report, Dr. Evans set forth specific questions for some of Ms. Garza's treating providers. MetLife provided a copy of the report and questions to the

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

1   treating providers, but MetLife terminated benefits without obtaining responses from the

2   treating physicians.

3       140.   On information and belief, because Ms. Garza was unable to seek medical

4   treatment at the time due to her health insurance and financial issues, her treating providers

5   were unable to respond to Dr. Evans' report.

6       141.   MetLife then referred Ms. Garza's file to Susan Sineni for an updated

7   vocational assessment.

8       142.   Ms. Sineni's February 29, 2016 updated EA Report was based on the same

9   erroneous information and restrictions from the previous EA Report, and took into account

10  Dr. Evans' additional restrictions.

11      143.   Still, Ms. Sineni identified occupations that Ms. Garza cannot realistically

12  perform, because they all require effective communication skills.

13      144.   As part of the EA Report, MetLife's third party vendor, CorVel, conducted a

14  labor market survey.

15      145.   According to its website, CorVel's company purpose "is to return injured

16  employees to the workplace." It serves as an advocate for insurance carriers by

17  "encourag[ing] a faster return to work, resulting in decreased claim costs."

18      146.   MetLife's use of a vendor whose goal is to help insurance companies stop

19  paying claim is evidence of MetLife's conflict of interest.

20      147.   CorVel purportedly contacted several employers for the selected occupations,

21  but it failed to identify any of them.

22      148.   MetLife refused to allow Ms. Garza an opportunity to respond to Ms. Sineni's

23  EA Report.

24      149.   The new evidence MetLife developed after Ms. Garza submitted her appeal is

25  further evidence of MetLife's conflict of interest, because it is a violation of ERISA, and its

26  only purpose was to advance MetLife's financial interest.

27      150.   MetLife relied on both Dr. Evans' report and Ms. Sineni's EA Report in

28  upholding its decision to terminate LTD benefits in a letter dated March 1, 2016 (the "Final

Denial").

151.    Given that both reports contained unreliable, biased and erroneous information that was contrary to the medical evidence and against physician opinions, MetLife erred in using them as a basis for its decision.

152.    MetLife failed to consider the new medical evidence provided with Ms. Garza's Appeal and instead relied exclusively on information that favored termination of benefits.

153.    MetLife claims, "[t]here was no specific rule or guideline specifically relied upon in making the claim determination at issue."

154.    In ERISA, a decision unhinged from rule or guidelines is virtually the definition of arbitrary and capricious claims handling.

155.    Verizon's Managed Disability Summary Plan Description states that it delegated responsibility for creating guidelines and procedures to MetLife.

156.    MetLife claims it doe not maintain any "Plan-specific internal guidelines." Thus, its decision cannot be based on the Plan.

*Ms. Garza's Social Security Disability Insurance ("SSDI") Benefits*

157.    Ms. Garza independently applied for SSDI benefits on October 16, 2013, two days before her LTD claim was initiated.

158.    On information and belief, Ms. Garza informed MetLife that she had already applied for SSDI benefits, but because MetLife had a difficult time understanding her on the phone, it was not noted in the file.

159.    On October 26, 2013, just two days after MetLife approved Ms. Garza's LTD benefits, MetLife began pushing the SSDI application process without realizing she had already begun the process.

160.    According to MetLife's claim notes, it anticipated a return-to-work date well before the start of the Any Occupation period, yet it continued to encourage Ms. Garza to apply for SSDI benefits.

161.    MetLife's efforts with respect to SSDI benefits, given its belief that Ms. Garza

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

would soon return to work is further evidence of MetLife's conflict of interest and of a corporate philosophy that encourages what would MetLife should know is Social Security fraud.

162.    MetLife referred Ms. Garza's file to its third party vendor, The Advocator Group ("TAG"), for possible representation on her SSDI matter, and did so without prior authorization from Ms. Garza.

163.    TAG is a third-party company that works closely with MetLife on a large number of disability claims administered by MetLife.

164.    MetLife recommended TAG to represent Ms. Garza on her SSDI matter.

165.    On information and belief, TAG was delayed in beginning representation on Ms. Garza's SSDI matter, because MetLife was waiting for appropriate authorization from Ms. Garza.

166.    On February 28, 2014, Ms. Garza's husband immediately informed MetLife of Ms. Garza's SSDI award.

167.    The SSA found that Ms. Garza "is unable to perform her previous employment as a customer service [representative] and meets listing 2.09 (Loss of Speech due to any cause, with inability to produce by any means speech that can be heard, understood or sustained.)"

168.    The SSA identifies medical conditions known as the "Listing of Impairments," including listing 2.09, which are considered severe enough to prevent an individual from doing any gainful activity.

169.    To meet a listing, the medical evidence must show that the condition has lasted or is expected to last for a continuous period of at least 12 months.

170.    Although the Plan does not have a listing like the SSA, the evidence considered and standards applied are comparable, and the SSA's findings of disability should be properly considered and given more weight, which MetLife failed to do.

171.    MetLife immediately began applying an SSDI offset to Ms. Garza's monthly LTD benefit amount, significantly reducing its financial liability.

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

172.    Just days before terminating Ms. Garza's benefits, MetLife discovered that Ms. Garza's SSDI amount was potentially greater than what was allotted, and it began attempting collection efforts.

173.    On information and belief, MetLife's collection efforts ceased in light of the upcoming benefits termination.

174.    MetLife's policy of recovering overpayments as described to Ms. Garza misstates and misrepresents the law.

175.    MetLife's overpayment policy as described to Ms. Garza is further evidence of MetLife's conflict of interest, because it advances MetLife's financial interests in derogation of Ms. Garza's rights under ERISA.

176.    When the SSA determined Ms. Garza to be disabled, it considered medical records that were mostly available to MetLife.

177.    In those records, the SSA considered "stable" or normal CT scans without evidence of cancer, and it still found Ms. Garza disabled. This is because regardless of whether the cancer was gone, the SSA understood the residual impact of thyroid cancer and subsequent procedures.

178.    Only MetLife attempts to ignore the long-term, debilitating nature of Ms. Garza's condition.

179.    MetLife required Ms. Garza to apply for SSDI benefits in order to avoid estimation of these benefits.

180.    Because MetLife required Ms. Garza to apply for SSDI benefits, MetLife is estopped from denying benefits for the same conditions for which she was approved by the SSA.

181.    MetLife was willing to rely on the SSA when it was to its benefit (to collect the offsets for Ms. Garza's SSDI benefits), but now rejects the SSA's determination without good reason.

182.    At the time of making its determination, MetLife did not have a copy of Ms. Garza's SSA file. Therefore, it could not have meaningfully considered the SSA's

1   determination.

2       183.    Nevertheless in its Denial, MetLife asserted that it had "taken into

3   consideration" Ms. Garza's SSDI award, but without the file, this was impossible.

4       184.    The law is clear about MetLife's obligation to secure the SSA file and explain

5   its reasons for disregarding the SSA's findings.

6       185.    Ms. Garza supplied MetLife with her SSDI file as part of her Appeal.

7       186.    In its Final Denial, MetLife acknowledged the SSDI file but only noted that

8   SSDI did not guarantee LTD due to different standards, yet MetLife failed to explain the

9   difference between them.

10      187.    MetLife failed to give proper weight to Ms. Garza's SSDI award.

## COUNT I
### (Recovery of Plan Benefits)

11

12      188.    All previous and subsequent paragraphs are incorporated by reference.

13      189.    The Plan is an Employee Welfare Benefit Plan as defined in ERISA, 29

14  U.S.C. § 1002.  Defendants are the Plan, Plan administrators, or Plan fiduciaries of the Plan

15  under ERISA.

16      190.    The Plan represents LTD coverage and a promise to provide LTD benefits

17  until Ms. Garza is no longer disabled under the terms of the Plan.

18      191.    Ms. Garza became disabled in 2012 and continues to be disabled under the

19  terms of the Plan. She is unable to perform any gainful occupation in her Local Economy.

20  She has claimed the benefits under the Plan to which she is entitled.

21      192.    Ms. Garza reasonably expected that her conditions met the requirements of

22  Disability as defined by the Plan for LTD benefits, and that she would receive benefits

23  under the Plan until age 67 or until she was no longer disabled.

24      193.    Despite the coverage of Ms. Garza's disability, MetLife has improperly

25  terminated LTD benefits to Ms. Garza in breach of the Plan and ERISA.  MetLife's

26  collective conduct was arbitrary, capricious, an abuse of discretion, not supported by

27  substantial evidence, and was clearly erroneous.

28

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ  85012
(602) 277-1745

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ  85012
(602) 277-1745

194.   In light of MetLife's structural conflict of interest and wholesale and flagrant procedural violations of ERISA, Ms. Garza should be entitled to de novo review.

195.   MetLife was determined to deny Ms. Garza's claim.

196.   MetLife failed to provide Ms. Garza with a description of any additional material or information "necessary" to "perfect the claim" and to do so "in a manner calculated to be understood by the claimant."

197.   MetLife "hid the ball" from Ms. Garza by failing to advise her of what was needed to approve the LTD claim, instead changing its reasons for termination. Initially, it found Ms. Garza was capable of performing her Own and Any Occupation even though, while she was on claim, it determined she could not work in her Own Occupation; by the Final Denial, it concluded that she was not capable of performing her Own Occupation but maintained that she could work in Any Occupation, and found completely different occupations.

198.   MetLife added new reasons for termination of benefits in its Final Denial, which violates ERISA.

199.   MetLife's adversarial actions precluded Ms. Garza from responding to MetLife's rationale for denial at the administrative level.

200.   MetLife wrongfully terminated Ms. Garza's disability benefits without providing a coherent explanation for its denials, and in a way that conflicts with the plain language of the Plan, violating 29 U.S.C. §§ 1109, 1132.

201.   MetLife did not properly consider all of the available evidence when terminating Ms. Garza's benefits. In doing so, MetLife failed to conduct a full and fair review.

202.   MetLife blatantly misstated medical evidence and misrepresented diagnostic testing for its own financial benefit.

203.   MetLife excessively relied on the flawed medical reviews and ignored substantial evidence to support Ms. Garza's disability.

204.   MetLife tainted its medical file reviewers in the review process by failing to

20

1    provide its reviewers with all of the relevant evidence.

2        205.   MetLife emphasized reports that favored a denial of benefits while

3    deemphasizing other reports that suggested a contrary conclusion, *e.g.,* by way of example, it

4    gave very little, if any, attention to the SSDI determination.

5        206.   MetLife failed to investigate Ms. Garza's claim adequately, including its failure

6    to conduct an in-person medical evaluation or request the SSDI file, which was necessary to

7    a full and fair review of Ms. Garza's claim. MetLife had ample opportunity to conduct an

8    evaluation prior to denial, but it depended instead on unreliable evidence to terminate Ms.

9    Garza's LTD benefits.

10        207.   MetLife failed to properly consider the opinions of Ms. Garza's treating and

11    examining physicians. It also failed to reasonably consider Ms. Garza's reported symptoms

12    and limitations, and side effects of her medications, in determining whether she was

13    disabled under the Plan.

14        208.   MetLife knew about Ms. Garza's worsening issues but chose to ignore those

15    findings. Indeed, MetLife acted arbitrarily and capriciously when it selectively reviewed Ms.

16    Garza's medical records, relying only on those portions of her medical records that

17    supported a denial of benefits.

18        209.   MetLife failed to properly consider Ms. Garza's SSDI award and the SSDI

19    file. It encouraged Ms. Garza to file for SSDI benefits through its preferred vendor and,

20    when the SSA awarded benefits, MetLife failed to address and distinguish its contrary

21    disability decision.

22        210.   The lip service MetLife paid to the SSA decision was disingenuous and

23    lacking in any meaningful rationale. MetLife collected SSDI offsets and then terminated Ms.

24    Garza's LTD benefits with the knowledge that she was financially drowning.

25        211.   MetLife's failure to properly consider the SSA decision is inexcusable,

26    especially because it had access to obtaining the SSDI file prior to the First Denial, and it

27    was provided by Ms. Garza with her Appeal.

28        212.   In terminating Ms. Garza's LTD benefits, it is uncontroverted – both in

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

MetLife's internal notes and the medical records – that Ms. Garza's conditions had not changed or improved.

213.   MetLife improperly demanded objective medical evidence and engrafted terms onto the Plan.

214.   On information and belief, the file reviewers, IPCs, and vendors used to administer Ms. Garza's claim were financially incentivized to deny Ms. Garza's claim.

215.   On information and belief, the file reviewer, IPCs, and vendors used to administer Ms. Garza's claims were chosen with the expectation they would support MetLife's financial interests.

216.   MetLife used in-house file reviewers, because it knew that the reviews would be unfavorable for the continuation of his benefits.

217.   MetLife unreasonably failed to ensure that its in-house file reviewers provided unbiased opinions for purposes of its claims administration.

218.   On information and belief, Drs. Turner and Evans have been retained by MetLife on numerous occasions to conduct claims reviews or other evaluations and has a history of bias against claimants.

219.   Drs. Turner and Evans arbitrarily reached their opinions based on insufficient evidence or investigation.

220.   On information and belief, Drs. Turner and Evans were not given the Plan or other important records for reaching their decision that Ms. Garza could perform sedentary work.

221.   Drs. Turner and Evans never spoke to Ms. Garza, and they never conducted an in-person evaluation of her.

222.   Ms. Garza continues to meet the definition of disability under the Plan.

223.   Ms. Garza has exhausted her administrative remedies.

224.   MetLife acted arbitrarily and capriciously in terminating Ms. Garza's claim.

225.   Pursuant to the coverage provided in the Plan, to ERISA 29 U.S.C. § 1132(a)(1)(B), and to applicable federal and state common law, Ms. Garza is entitled to

recover all benefits due under the terms of the Plan, and to enforce her rights under the Plan.

226.    Ms. Garza is entitled to reinstatement of any other employee benefits that were terminated, discontinued, or suspended as a result of the termination of her disability benefits. She is entitled to a restoration of the *status quo ante* before LTD benefits were wrongfully terminated.

227.    Pursuant to 29 U.S.C. § 1132(g), Ms. Garza is entitled to recover her attorneys' fees and costs incurred herein from MetLife and the Plan.

228.    Ms. Garza is entitled to prejudgment interest on the benefits to which she is entitled and on her damages at the highest legal rate until paid.

**WHEREFORE**, on all claims, Ms. Garza prays for entry of judgment against Defendants as set forth in this Complaint, which includes:

A.    All past due LTD benefits under the terms of the Plan;

B.    Clarifying and determining Ms. Garza's rights to future benefits under the terms of the Plan;

C.    An award of Ms. Garza's attorneys' fees and costs incurred herein;

D.    An award of prejudgment interest on benefits and damages at the highest legal rate until paid; and

E.    For such and further relief as the Court deems just, equitable, and reasonable.

Dated this 19th day of September, 2016.


OBER & PEKAS, PLLC

By: *s/ Kevin Koelbel*
        Kevin Koelbel
        Erin Rose Ronstadt
        Attorneys for Plaintiff

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745